# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WISCONSIN
### MADISON DIVISION

| | |
|---|---|
| Virginia Prust, Individually and as Special Administrator for the Estate of Valmore Prust, Deceased,<br><br>      Plaintiff,<br><br>  v.<br><br>Weyerhaeuser Company, *a corporation;*<br>3M Company, *a corporation*;<br>Metropolitan Life Insurance Company*, a corporation*;<br>Owens-Illinois, Inc., *a corporation*;<br>Unknown Insurers of Owens-Illinois, Inc., *a corporation;*<br>Unknown Insurers of Roddis Plywood Corporation, *a corporation;*<br>Unknown Insurers of Weyerhaeuser Company, *a corporation;*<br><br><br>     Defendants. | Case No. 14-cv-143 |

## SECOND AMENDED COMPLAINT

Plaintiff Virginia Prust, by her attorneys, Cascino Vaughan Law Offices, Ltd., complains against the above defendants as follows:

### JURISDICTION AND PARTIES

1.  Plaintiff Virginia Prust is the widow of decedent and is an adult citizens and resident of Marshfield, Wisconsin.

2.  Decedent Valmore Prust died in the state of Wisconsin on May 17, 2011. Prior to his death, decedent was an adult citizen and resident of Marshfield, WI.

1



3.  Defendant Weyerhaeuser Company ("Weyerhaeuser") is the former owner of a plant in Marshfield, Wisconsin ("Marshfield plant") where asbestos fireproofing products were manufactured and asbestos containing products were used in manufacturing production of fire doors.  Weyerhaeuser is legally responsible for the conduct of Roddis Plywood Corporation, the prior owner and operator of the Marshfield plant.

4.  Defendant 3M Company ("3M") designed, manufactured, and sold masks for personal breathing protection in occupational settings, including without limitation the 3M 8710.

5.  Defendant Metropolitan Life Insurance Company ("MetLife") conspired and acted to conceal information about the health hazards of asbestos from both individual end-users and industry.

6.  Defendant Owens-Illinois, Inc. ("O-I") designed and manufactured a product called Kaylo which contained amosoite and chrysotile asbestos. O-I also sold licenses for a process patent to manufacture of fire doors incorporating asbestos-containing cores.  O-I also manufactured, sold, and designed asbestos products, including without limitation fire door cores.  The brand name "Kaylo" was associated with both the patented doors and the cores.

7.  Unknown Insurers of Owens-Illinois, Inc. are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

8.  Unknown Insurers of Roddis Plywood Corporation are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

9.  Unknown Insurers of Weyerhaeuser Company are named pursuant to Wis. Stats. §803.04(2)(a) as they have an interest in the outcome adverse to the plaintiffs.

2

10.  Jurisdiction is based on diversity of citizenship of the parties hereto under Title 28, United States Code, §1332.

11.  The amount in controversy exceeds the sum of Seventy-Five Thousand Dollars ($75,000), exclusive of interest and costs.

12.  Venue is proper pursuant to Title 28, United States Code, §1391.

## GENERAL ALLEGATIONS

13.  During the period of all his exposures, decedent did not understand or appreciate the dangerous nature of asbestos and of the nature of the risks of asbestos.

14.  As a direct and proximate result of the conduct of all defendants, decedent suffered from the asbestos related disease lung cancer diagnosed on January 5, 2010.

15.  The asbestos disease process and injury began before April, 1994.

16.  All exposures to asbestos that decedent received contributed to and caused the decedent's asbestos related conditions.

17.  Decedent suffered great pain, physical impairment, and great mental pain and anguish. He is liable for large sums of money for medical and hospital care, and suffered losses to his personal property and possessions. Further, as a result of decedent's death, funeral, cemetery, and related expenses and costs have been incurred.

18.  At all times, Plaintiff Virginia Prust was the wife of the decedent and was cohabitating with him and was enjoying his services, companionship, society and relationship.

19.  As a result of decedent's disease and his resulting death, his next of kin have suffered and will suffer in the future pecuniary losses and have suffered and will suffer in the future a loss of society and companionship with him.

3

20.   As a direct and proximate result of the one or more of the wrongful acts or omissions of the defendants, Plaintiff

    a.   has been deprived of Valmore Prust's services, companionship, society, and relationship from the time of his injury;

    b.   has been hindered and prevented from transacting and attending to her usual

business and personal affairs.

21.   The operations at the Marshfield plant involve the manufacture of asbestos containing fire doors, including the disposal of the waste and scrap from such doors.   At certain times the mixing of asbestos fibers to make the cores for the fire doors was a part of the manufacturing process.

22.   Decedent inhaled airborne asbestos fibers released as a result of operations at the Marshfield plant as an employee of Weyerhaeuser, household exposures from his and his wife's clothes, and community exposures via ambient air outside the plant.

23.   Asbestos was inhaled by decedent:

    a.   during periods of his actual employment at the Marshfield plant, from 1958 or 1959 to approximately 1978;

    b.   household and family asbestos exposures prior to 1972 shaking out and the washing of his wife's clothes and the clothes of his children, who also worked at the plant;

    c.   community exposures from asbestos fibers from the Marshfield plant contaminating the air, home, schools, auto, restaurants, bars and other locations outside the plant;

    d.   community exposures during his whole life including when he was not employed at the Marshfield plant, from visible emissions of asbestos dust in the community of Marshfield;

    e.   community exposures during plaintiff's life, including when he was not employed at the Marshfield plant from the transport of asbestos fibers to and from the

Marshfield plant to other locations in the Marshfield community including the creation of visible emissions throughout the community of Marshfield;

f.     community exposures during decedent's life, from the release of visible emissions by activities outside the plant, including by trucks driving down the road, not while plaintiff was employed;

g.     community exposures during decedent's life, from the dumping of asbestos waste in landfills and former soaking ponds throughout the Marshfield community, not while employed;

h.     during decedent's life, from visible emissions when the baghouse malfunctioned and released asbestos into the community, not while employed;

i.     during decedent's life, from the open doors of buildings, wherein asbestos was part of any industrial process and through which wind would blow asbestos out of the plant, not while employed;

## VALMORE PRUST EMPLOYMENT HISTORY

24.     Decedent Valmore Prust was in the Army in Germany right out of high school, then started work at Weyerhaeuser in 1958 or 1959, and worked there until around 1978. At Weyerhaeuser, decedent worked in the paint shop and "on the shelf"– in the panel department. After Weyerhaeuser, decedent worked as a carpenter. Plaintiff Virginia Prust continued to work at Weyerhaeuser after decedent stopped working there. Plaintiff would come home with dusty clothes. This dust would be in the home where decedent Valmore Prust would breathe it. Weyerhaeuser continued to use asbestos in their doors through the 1970s. There were shipments of asbestos in December of 1979.

## PRUST COMMUNITY AND HOUSEHOLD EXPOSURES

25.     Decedent Valmore Prust attended Marshfield High School less than a mile from the plant. He graduated in 1954 and joined the United States Army. Decedent was also a member of the Immanuel Lutheran Church from 1958 to 1963, where he sang in the choir. This church

is less than a mile from the plant. Decedent Prust started working at Weyerhaeuser in approximately 1958 until around 1978.

26. Before decedent Valmore Prust married plaintiff Virginia Prust on June 25, 1960, decedent lived on Main Street in close proximity to the Weyerhaeuser plant. After they were married, they lived on Cherry Street, also in close proximity to the plant. Plaintiff Virginia Prust lived close enough to walk to work. After 1963, the Prust family moved to 1518 South Locust Street.   The South Locust street address was 1.3 miles from the plant. After work, Virginia, Valmore, and friends would regularly go to Miller's QuicLunch for a meal and/or some beers. It was "right next door" to the plant. Miller's was at 208 South Palmetto.

27. The Weyerhaeuser trucks that were loaded with asbestos waste were driven down highways 97, 13 and 10. These are the main streets both into and out of Marshfield. There were visible emissions from these trucks as they transported asbestos waste down public highways.

28. Pecher's activities and the conduct of Weyerhaeuser placed him within the distances from the plant which are recognized in the scientific literature as having significant concentrations of asbestos or increased risk of developing mesothelioma.

29. The community of Marshfield, Wisconsin was exposed to asbestos from the Marshfield Plant. The plant had a baghouse, wherein asbestos was collected. This system continually broke down and sent asbestos dust into the ambient air. People in the neighborhood complained about this dust.

30. Neighbors around the premises complained to Weyerhaeuser and wrote letters to the local

newspaper about the dust, especially since it ruined the laundry they had hung out to dry. The baghouse continuously became congested and broke down, spewing dust out of the sides and top and dispersing it into the ambient air. Because of this, people could not hang their laundry out to dry.

31. The dust collected in the baghouse was hauled to various landfills in and around Marshfield, as well as three old log ponds between the plant and Fourth Street. These log ponds were partially filled with waste from the baghouse. The waste was hauled in large uncovered boxes on the front end of a loader and driven outside the plant's fence and along a driveway around the plant's western side. There was visible dust in the log ponds because Weyerhaeuser chose to never cover them. Weyerhaeuser simply dumped asbestos waste into them. Dumping asbestos waste into these log ponds put even more asbestos dust into the ambient air.

32. Windows in the core mill were left open during the summer, allowing asbestos dust to get into the plant's ambient air.

33. The trucks dispersed visible asbestos dust while driving down the roads. At least one of these trucks was not covered. The Weyerhaeuser trucks that were loaded with asbestos waste were driven down highways 97, 13 and 10. These are the main streets both into and out of Marshfield. There were visible emissions from these trucks as they transported asbestos waste down public highways.

34. Places in town, such as the cheese factory, bars and hamburger restaurants, close to the Weyerhaeuser plant would have their ambient air contaminated by visible asbestos dust.

35. The baghouse that was intended to collect asbestos waste products continually and

7

regularly broke down, dispersing asbestos into the ambient air.

## COMMUNITY EXPOSURES CAUSE MESOTHELIOMA

36. The Environmental Protection Agency (EPA) via its National Emission Standards for Hazardous Air Pollutants (NESHAPs) bars visible emissions of asbestos materials outside the plants involved in the manufacture of fireproofing and insulating materials. NESHAPs recognized that persons in the neighborhood of asbestos sources develop mesothelioma.

37. Roddis/Weyerhaeuser caused visible emissions of asbestos dust into the air outside the Weyerhaeuser plant in Marshfield, Wisconsin.

38. Community exposures are well-recognized as sources of asbestos exposure.

39. The Environmental Protection Agency, subchapter C – Air Program, Part 61, National Emission Standards Hazardous Air Pollutants (hereafter NESHAP), adopted a no visual asbestos emissions standard for plants manufacturing fireproofing materials based upon recognized reports of mesothelioma associated with non-occupational asbestos dust emissions in the neighborhood. It also recognized that mesothelioma cases can occur after much less exposure to asbestos dust.

40. On March 30, 1973, NESHAP was enacted. Section 61.22, "Emission standard," provided that

> "There shall be no visible emissions to the outside air, except as provided in paragraph (f) of this section, from any building or structure in which the following operations are conducted or directly from any of the following operations if they are conducted outside of buildings or structures...[which applies to the] manufacture of fireproofing and insulating materials."

8

41.     NSESHAPs cited literature that there are mesothelioma cases of non-workers who lived

        near an asbestos plant. Some of this literature is part of the body of references that the EPA

        relied upon in the formulation of its "no visible emissions" standard.   This literature

        includes Dr. Wagner, who in the British Journal of Industrial Medicine in 1960 found that

        most cases of mesothelioma were not workers in asbestos-related fields, but people who

        lived in the surrounding communities. Wagner, in his study of mesothelioma in asbestos

        mine workers, identified housewives, domestic servants, cattle herders, farmers, an

        insurance agent and an accountant in the neighborhood who also developed mesothelioma

        but never worked in the mines. This literature cited in NESHAPs also includes Newhouse

        and Thompson who in 1965 reported community exposures caused mesothelioma cases in

        London. Similarly, in 1967, the Archives of Environmental Health reported mesothelioma

        cases from neighborhood exposures.

42.     In addition, Inase identified a woman with mesothelioma in Japan whose only exposure to

        asbestos occurred during her childhood as a result of asbestos exposure from the emissions

        from the town's factories. Inase also summarized the literature on this issue including

        articles published from studies in the United States, Italy, the United Kingdom and South

        Africa.

43.     Community exposures from asbestos plants occur miles from the plant site.   When

        decedent was within several miles of the plant he would be exposed to asbestos.   A study

        published in the American Journal of Industrial Medicine by Kumagai and Kurumatani

        used a mesothelioma outbreak in Amagasaki city, in southwestern Japan, found a linear

        relation between asbestos concentration and the reported cases of mesothelioma. The

outbreak was tied to an asbestos cement factory that produced asbestos pipe with crocidolite and chrysotile, which operated from 1957 to 1975.   Concentrations of asbestos measured in excess of background levels. Of particular interest is the higher mortality rate in women due to mesothelioma. During the years the asbestos cement plant was operational, women did not work and stayed either at home or out in the community. Kumagai and Kurumatani therefore used women as a benchmark for overall community exposure. They found that mortality decreased with distance from the plant, up to a range of approximately 4 kilometers (approximately 2.48 miles). Of 39 mesothelioma deaths in women, all lived within 4 kilometers of the asbestos cement plant for at least 1 year, died from mesothelioma between 1995 and 2006, and lacked occupational exposure to asbestos.

44.   There is also increased risk for developing mesothelioma from community exposures.   A study published in the British Journal of Cancer by Magnani, et al., reached a similar conclusion through different methods. Their study also found a higher rate of mesothelioma in females, for whom no evidence of occupational exposure to asbestos was found. Magnani and the other scientists concluded that the risk of developing mesothelioma was statistically and significantly higher for environmental exposure, when compared to domestic or household exposure, in mesothelioma patients who had lived at some time within 2000 meters (approximately 1.25 miles) of a mine or asbestos works. The study also observed that "environmental exposure to asbestos started at younger ages and lasted longer" than domestic exposure. Overall, Magnani's study concluded that while "[environmental and domestic exposures], either alone or combined with the other, showed

an increased, significant risk...[but that risk] seems to be higher for subjects with environmental exposure only."

45.     The sources of the visual emissions outside the Marshfield plant included:

a.      The emissions' sources included the wind that blew visible asbestos dust from open doors of buildings in which asbestos was used into the air outside the plant;

b.      emissions into the community's ambient air from Weyerhaeuser's trucks containing asbestos waste materials along the trucks' routes throughout the town of Marshfield;

c.      The emissions' sources included asbestos dust that fell from the air pollution control equipment, including the baghouse, when these devices failed. This asbestos dust would collect in piles and then be dispersed by the wind into the ambient air outside the plant.

d.      The emissions' sources included trucks loaded with asbestos waste materials. These trucks were not properly covered. At any given time, there were two truck drivers working 12-hour shifts disposing of asbestos waste materials at former soaking pits, at least 4 landfills and farmers' fields across Marshfield, Wisconsin.

e.      The emissions' sources included the former soaking pits, at least 4 landfills and farmers' fields where asbestos waste materials were dumped. After the waste materials were dumped, they were not properly covered, and wind dispersed visible emissions of asbestos into the ambient air and community of Marshfield, Wisconsin.

f.      The Weyerhaeuser trucks drove down the main streets of Marshfield, Wisconsin and gave off visible asbestos emissions.

11

## SCIENTIFIC BASIS FOR FAMILY EXPOSURES
## FROM CONTAMINATED WORK CLOTHES

46.    The potential for carrying hazardous materials home and exposing other people has been known for centuries. Ramazzini, in 1713, described diseases found in laundresses who "wash bed-linen and underclothes stained with a thousand kinds of filth...they inhale by mouth and nose a mixture of harmful vapors of all sorts."[1]

47.    In 1913, Tolman et al., in their textbook "Safety", recognized the hazards associated with carrying "poisons" home on work clothes when they stated, "By removing the working-clothes before meals and before leaving the factory the poison is not carried into the lunchrooms or into the homes of the workers."[2]

48.    The US Department of Labor issued safety and health standards in 1951 that included the requirement that, "Workers who handle or are exposed to harmful materials in such a manner that contact of work clothes with street clothes will communicate to the latter the harmful substances accumulated during working hours should be provided with facilities which will prevent this contact and also permit the free ventilation or drying of the work clothes while they are not in use."[3]

49.    In 1960, Wagner et al., published their landmark study showing the prevalence of

---

[1]Ramazzini, B: *Diseases of Workers, 1713,* p. 255, Translated by W.C. Wright, Hafner Publishing Company, New York, 1964.

[2]Tolman, W.H., *Safety, Methods for Preventing Occupational and Other Accidents and Diseases*, Harper & Brothers Publishers, New York and London, 1913, p. 249.

[3]_____, *Safety and Health Standards*, United States Department of Labor, paragraph H3(b), 1951, p. 23.

mesothelioma in household contacts and residents near asbestos mines.[4]

50.     The National Safety Council published a Data Sheet on safety procedures for handling hazardous materials in industry. This 1963 document recommended "[g]ood washing facilities, clean lunchrooms, and clean clothes can help prevent additional, even though minor, exposure to toxic materials. Also, contaminated work clothes should not be taken home where a toxic dust could contaminate the home or expose other members of the family."[5]

51.     In 1965, Newhouse et al., published their study showing a clear association of mesothelioma among household members (children and housewives) whose only known exposure to asbestos was contamination brought home by another household member with occupational exposure to asbestos.[6]

52.     P.G. Harries, in 1968, published an article concerning the necessity of providing workers exposed to asbestos with protective clothing and respiratory protection as well as using typical engineering controls such as isolation and ventilation.[7] He also reported mesothelioma in Boilermakers, Fitters, Laborers, Shipwrights, and Welders at the shipyard

---

[4]Wagner, W.C., *Diffuse Pleural Mesothelioma and Asbestos Exposure in the North Western Cape Province*, Brothers Publishers, New York and London, 1913, p. 249.

[5]_____, *Dusts, Fumes, and Mists in Industry,* Data Sheet #531, National Safety Council, 1963, p. 15.

[6]Newhouse, M.L. et al., *Epidemiology of Mesothelioma Tumors in the London Area*, Annals of the New York Academy of Sciences, Vol. 132, 1965, pp. 579-588.

[7]Harries, P.G. et al., *Asbestos Hazards in Naval Dockyards*, Annals of Occupational Hygiene, Vol. 11, 1968, p. 140.

13

he studied.[8]

53.   The National Institute for Occupational Safety and Health (NIOSH) reported, in 1972, cases of mesothelioma in children and housewives who washed the work clothes of family members who brought home asbestos-contaminated clothing.[9] They proposed to the Occupational Safety and Health Administration (OSHA) regulatory language to require employers to provide workers exposed to asbestos with separate "coveralls or similar full-body protective clothing and hat."[10]

54.   OSHA promulgated its individual asbestos regulation in 1972.[11] It required issuance of protective clothing and the special handling of asbestos-contaminated clothing during transport and laundering.

55.   Anderson, et al., in 1976, reported on their study of the disease status of household contacts of asbestos factory workers. They reported some 35% of all household contacts, whose only known exposure to asbestos were from contamination brought home by a household member who was exposed to asbestos in their work place, had asbestos-associated radiographic abnormalities.[12] In their 1979 follow-up study, they had identified five

---

[8] *Ibid.,* p. 138.

[9] _____, *Occupational Exposure to Asbestos,* National Institute for Occupational Safety and Health, 1972, pp. III-9, III-22.

[10] *Ibid.,* p. I-8, I-9.

[11] _____, *Asbestos*, The Occupational Health and Safety Administration, June 7, 1972, paragraph (d)(3) & (4).

[12] Anderson, H.A., *Household-Contact Asbestos Neoplastic Risk*, Annals New York Academy of Sciences, Vol. 271. 1976, pp. 387-399.

household contacts with mesothelioma.[13]

56.     Sawyer in 1977 reports on an investigation of asbestos exposure concentrations in a college building.[14] As part of their studies they collected the work clothes of abatement workers and laundered them. They collected 12 personal air samples while washing some 40 sets of work clothes. Results averaged 0.4f/cc [SD 0.2f/cc] with the highest concentration of 1.2 f/cc. They also took area samples:

    a.          Picking up clothes – 4 samples, Ave = 0.4 f/cc, SD 0.1 f/cc;

    b.          Loading washing – 5 samples, Ave = 0.4 f/cc, SD 0.1 f/cc; and

    c.          Loading dryer – Ave = 0.0 f/cc [Sic].

57.     Bellin summarized the more current literature on this subject in 1981.[15] She reviews cases of mesothelioma among wives and children of asbestos workers whose asbestos exposure was from washing the workers' clothing.

58.     Grandjean, et al., summarized the literature concerning indirect exposure to hazardous materials, including asbestos.[16] The literature clearly establish asbestos-related diseases among household members whose only known exposure arose from living in the same house or handling contaminated clothing of other members who were occupationally

---

[13]Anderson, H.A., *Asbestos Among Household Contacts of Asbestos Factory Workers*, Annals New York Academy of Sciences, 1979, pp. 387-99.

[14]Sawyer, R.N., *Asbestos Exposure in a Yale Building*, Environmental Research, Vol. 13, pp. 146-69, 1977.

[15]Bellin, J.S., *"Don't Take Your "Work" Home With You,"* Occupational Health and Safety, June 1981, pp. 39-42.

[16]Grandjean, P., *Indirect Exposures: The Significance of Bystanders at Work and Home*, American Industrial Hygiene Association Journal, December 1986, pp. 819-824.

exposed to asbestos.

59.     In 1992, the US Congress requested NIOSH to conduct a study to "evaluate the potential for, the prevalence of, and the issues related to the contamination of workers' homes with hazardous chemicals and substances...transported from the workplaces of such workers."[17] NIOSH issued their report in 1995 with an entire section devoted to asbestos.[18] NIOSH concluded:

> "Families of asbestos-exposed workers have been at increased risk of pleural, pericardial, or peritoneal mesothelioma, lung cancer, cancer of the gastrointestinal tract, and non-malignant pleural and parenchymal abnormalities as well as asbestosis";

and

> "The occupations associated with asbestos-related disease in family members are those where workers were exposed to asbestos dust during: construction and renovation; prospecting and mining; manufacturing textiles, tiles, boilers, and ovens; shipbuilding and associated trades; certain railroad shop trades; welding; insulation; use and manufacture of asbestos products such as cords, seals, and plates; and renovation and demolition projects within the construction industry."[19]

60.     Roggli, et al., reviewed 1445 cases of mesothelioma and classified them by occupational exposure to asbestos.[20] He identified 86 cases he classifies as household contacts where the

---

[17] _____, *"The Worker's Family Protection Act,"* 29 U.S.C. 671a, 1992.

[18] _____, *"Report to Congress on Workers' Home Contamination Study Conducted under The Worker's Family Protection Act (29 U.S.C. 671a)*, National Institute for Occupational Safety and Health, Cincinnati, Ohio, September 1995.

[19] *Ibid.,* p. 6.

[20] Roggli, V.L., et al., *Malignant Mesothelioma and Occupational Exposure to Asbestos: A Clinicopathological Correlation of 1445 Cases,* Duke University Medical Center, 2002.

only known exposure was from another household member who was an asbestos worker.[21]

61.  Carter measured the airborne concentrations of asbestos created from asbestos-contaminated laboratory coats worn by workers who were simulating operating small machines in an unventilated room and handling, carrying and stacking asbestos-containing cement board.[22] He measured airborne concentrations between $3.3 \times 10^6$ fibers per cubic meter (0.3 f/cc to 2.4 f/cc).

62.  NIOSH conducted an experiment where they measured the airborne concentrations of asbestos generated from shaking an empty burlap bag that had contained pure asbestos.[23] The only source of asbestos was that remaining as contamination of the bag. The people conducting the experiment were exposed to airborne concentrations as high as 570 f/cc (>5 micron).

63.  Schneider, et al., reported on five cases of mesothelioma seen in their clinic.[24] The patients had no history of occupational exposure to asbestos but resided in the household of workers who had been occupationally exposed to asbestos. They concluded that their only exposure to asbestos was from the clothing and shoes of the exposed workers. Patient exposures began in the 1950s or 1960s and the latency period ranged from 17 to 42 years. The patients' fathers' work activities included manufacturing asbestos-containing

---

[21]*Ibid.,* p. 20.

[22]Carter, R.F., *The Measurement of Asbestos Dust Levels in a Workshop Environment,* AWRE Report No. 0 28/70, United Kingdom Atomic Energy Authority, July 1970, Table 4.

[23]Fleming, R.M., *"Asbestos–Burlap Bags"*, National Institute for Occupational Safety and Health, 1972.

[24]Schneider, J., *Pleural Mesothelioma and Household Asbestos Exposure*, Reviews on Environmental Health, Vol. 11, NOS. 1-2, 1996, pp. 66-67.

products, turbine repair, and insulation.

64.     Longo conducted a series of experiments to estimate asbestos fiber release from contaminated clothing.[25, 26, 27] Under controlled conditions, they contaminated typical work clothing by handling asbestos-containing insulation. They then shook and brushed the clothes to represent someone, like a housewife, cleaning the dust off prior to placing into the washing machine. The clothes were shaken for approximately 1 minute. The operation took 7-8 minutes, including shaking, brushing and placing the clothes into the washing machine. Exposure concentrations experienced by the person handling the contaminated clothing ranged from 5.74 f/cc to 26.5 f/cc.

65.     Mangold conducted a series of experiemtns to determine the exposure concentrations generated solely by contaminated clothing.[28] Results were as follows:

a.      Heavily contaminated coveralls used during rip out of pipe insulation (3 samples). Results = 1, 1.8, and 1.5 f/cc (Average = 1.4 f/cc);

b.      Medium contaminated coveralls worn three days before change (3 samples). Results = 0.2, 0.5, and 0.8 f/cc (Average = 0.5 f/cc);

c.      Lightly contaminated coveralls worn three days before change (3 samples). Results = 0.1, 0.2, and 0.05 f/cc (Average = 0.1 f/cc).

## COUNT I - PRODUCT LIABILITY - NEGLIGENCE

---

[25]Longo, W., *"Secondary Exposure from Work Clothing",* MAS Report, 1999.

[26]Longo, W., *"Secondary Exposure from Work Clothing II",* MAS Report, 1999.

[27]Longo, W., "Secondary Exposure from Work Clothing III", MAS Report, 1999.

[28]Mangold, C.A., *"The Effects of Contaminated Clothing on the Sampling of Low-Level Asbestos Fiber Concentrations in the Breathing Zone of Workers"*, Presentation to the Pacific Northwest Section, American Industrial Hygiene Association, Portland, Oregon, October 11, 1984.

66.     Plaintiff brings this claim for negligence and restate and re-allege the allegations in
        paragraphs 1 – 65 above.

67.     Plaintiff brings this claim against O-I and unknown insurers of O-I for selling, purchasing,
        manufacturing, designing, licensing and/or patenting of a process that used
        asbestos-containing materials and/or products.

68.     The term "Kaylo fire doors" is used to refer to both O-I patented doors and cores sold by
        O-I. "Kaylo" was a registered trademark of O-I.

69.     O-I manufactured Kaylo block insulation that was used as the fire door core material inside
        the fireproof doors.

70.     O-I designed, manufactured, and sold Kaylo core to Roddis during the late 1940s into the
        late 1950s.

71.     The Kaylo core was used to make fire doors. It would be cut, sawed, and sanded.

72.     Decedent was exposed to Kaylo dust in the 1950s via community exposures.

73.     Decedent went to high school and attended a church close to the plant during the 1950s.

74.     O-I sold Kaylo block insulation that was used by Roddis/Weyerhaeuser as the fire door
        core material inside the fireproof doors.

75.     Owens Corning Fiberglass, through an agreement with Owens-Illinois, was the distributor
        of Kaylo block insulation for Owens-Illinois. Owens-Illinois was paid compensation by
        Owens Corning Fiberglass under the distribution agreement.

76.     Pursuant to a written agreement, defendant O-I allowed Roddis/Weyerhaeuser to
        manufacture the Kaylo asbestos-containing fire doors at least through September of 1959.

77.     Roddis/Weyerhaeuser licensed the process to make asbestos-containing fire doors from

19

1956 to 1969. The fire door cores contained asbestos because O-I reported asbestos as an ingredient in order to obtain a patent for the process.

78.    After O-I ceased the sale of asbestos-containing fire doors, Roddis/Weyerhaeuser were given permission by O-I to use O-I's name in the advertisements for Kaylo block insulation fore doors. These advertisements also listed Roddis Plywood Corporation as the successor to Owens-Illinois Plywood Company.

79.    Pursuant to a written license agreement, O-I was paid a royalty for each Kaylo fire door produced pursuant to the patented process. The patent called for the use of asbestos. The Underwriters Laboratories approval was based on the use of asbestos in the fire doors.

80.    It was reasonably foreseeable to O-I that decedent and other workers working in or in proximity to Kaylo fire door production operations at Weyerhaeuser would inhale asbestos fibers released from the Kaylo fire doors during the production operations.

81.    Defendant O-I knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes serious and fatal disease. O-I had knowledge in the 1940s and 1950s that asbestos was harmful and caused disease. O-I was a manufacturer and vender of asbestos products, beginning in the 1940s and continuing through the 1950s. O-I had participated in scientific experiments that resulted in literature concerning the harmful effects of asbestos as early as the 1940s.

82.    Decedent did not know that asbestos products were dangerous or harmful at the time of his exposures.

83.    Defendant O-I had a duty to exercise reasonable care for the safety of decedent and others who worked with or were exposed to the defendants' asbestos products. As early as the

1940s, defendant O-I was on notice that asbestos was harmful and even conducted studies concerning the dangers of asbestos.

84. Defendant O-I breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

    a.    Failed to adequately warn decedent or others of the health hazards of asbestos associated with Kaylo fire doors;

    b.    Failed to investigate or test for the health effects of asbestos in Kaylo fire doors;

    c.    Failed to instruct decedent, his employers, patent licensees, or others in the use of precautionary measures relating to airborne asbestos fibers released during production of Kaylo fire doors;

    d.    Defectively designed the Kaylo fire doors to incorporate asbestos as an ingredient or material in their production when substitute materials were available.

85. As a direct and proximate result of the acts and omissions of the defendant O-I above, the decedent was injured as described above.

## COUNT II – PRODUCT LIABILITY (UNREASONABLY DANGEROUS PRODUCT)

86. Plaintiff brings this claim for strict product liability and restate and re-allege the allegations in paragraphs 1 – 85 above.

87. This claim is asserted against O-I.

88. Defendant was in the business of selling Kaylo fire doors (including patent rights, doors, and cores) and other asbestos containing products.

89. O-I designed, manufactured, and sold Kaylo core to Roddis during the late 1940s into the late 1950s.

90. The Kaylo core was used to make fire doors. It would be cut, sawed, and sanded.

91. Decedent was exposed to Kaylo dust in the 1950s via community exposures.

92.     Plaintiff went to high school and attended a church close to the plant during the 1950s.

93.     Pursuant to a written agreement, O-I sold the patented process right for each Kaylo fire door produced by Weyerhaeuser and collected a royalty payment.

94.     The Kaylo patent process was sold with the expectation by O-I that the process would be without substantial change and the production of doors pursuant to the process would release asbestos fibers in the air.

95.     Decedent was exposed to asbestos fibers released during the production of the Kaylo fire doors pursuant to the patented process.

96.     Defendants' patented process was defective and unreasonably dangerous in one or more of the following ways:

   a.      Failed to adequately warn decedent or others of the health hazards of asbestos released during production of Kaylo fire doors;

   b.      Failed to investigate or test for the health effects of asbestos released during production of Kaylo fire doors;

   c.      Failed to instruct decedent, his employers, patent licensees, or others in the use of precautionary measures relating to airborne asbestos fibers released during production of Kaylo fire doors;

   d.      Defectively designed the Kaylo fire doors to incorporate asbestos as an ingredient or material in their production when substitute materials were available.

97.     As a direct and proximate result of the acts and omissions of the defendants above, the decedent was injured as described above.


## COUNT III – NEGLIGENT NUISANCE

98.     Plaintiff incorporates by reference all general the above allegations and brings this count

22

against defendant Weyerhaeuser for negligent public and private nuisance.

99.   Weyerhaeuser is responsible for the ownership and operation of the door manufacturing plant in Marshfield, Wisconsin during the period of decedent's exposures.

100.  Weyerhaeuser, during operations to manufacture fire doors at the Marshfield plant beginning in the 1950s, caused asbestos fibers to be released and contaminate the air in various settings when decedent was not employed by Weyerhaeuser and was not engaged in work-related activities, including without limitation:

  a.  living in the community of Marshfield;

  b.  schools, homes, restaurants, taverns, vehicles and a creamery;

  c.  emptying the air pollution control equipment;

  d.  transportation of asbestos waste materials outside the plant onto roads, farmers' fields, old soaking pits and landfills;

  e.  activities on the premises which were not work related; and

  f.  failure of air pollution control equipment that released visible asbestos dust outside of the plant.

101.  The operations of Weyerhaeuser's Marshfield plant caused dangerous asbestos fibers to be transported to areas more distant through various means, including without limitation:

  a.  worker clothing, personal effects, hair, and skin which had become contaminated by asbestos fibers at the plant; and

  b.  collecting, removing, hauling, and dumping asbestos waste materials.

102.  The visible plant emissions and transport of asbestos fibers as described above caused contamination of the community, schools, downtown Marshfield, housing, vehicles, restaurants, bars, creamery and other places frequented by decedent Valmore Prust.

23

103.     Decedent and others inhaled asbestos fibers from the contaminated air and property.

104.     The contamination by the asbestos fibers is an unreasonable interference with a right common to the general public to clean air.

105.     The contamination by the asbestos fibers is an unreasonable interference with decedent's private rights, including the right to use and enjoy private property.

106.     The unreasonable interference with the decedent's private rights and property and the public's right to clean air is unrelated to any employment relationship or duties with defendant.

107.     Weyerhaeuser Company had a duty to exercise reasonable care for the safety of decedent and the public from asbestos fibers released during Weyerhaeuser's operations of the Marshfield plant or transported to other locations as a result of plant operations.

108.     Weyerhaeuser knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes disease and/or death.

109.     Decedent did not know that asbestos or asbestos products were so dangerous or harmful at the time of his exposures.

110.     Weyerhaeuser knew or in the exercise of ordinary or reasonable care ought to have known that Weyerhaeuser's Marshfield plant operations released asbestos into the community or resulted in transport of asbestos fibers to other locations as a result of plant operations.

111.     Weyerhaeuser permitted the Marshfield plant operations to continue without abating the release into the community and transport to other locations of asbestos fibers.

112.     Weyerhaeuser breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

a. Failed to adequately warn decedent or others of the health hazards of asbestos;

b. Failed to adequately investigate health effects of asbestos;

c. Failed to adequately test for air levels of asbestos;

d. Failed to adequately instruct decedent or others in the use of precautionary measures relating to airborne asbestos fibers;

e. Used defectively designed asbestos-containing products when substitutes were available;

f. Failed to use proper engineering techniques or methods, or used unsafe techniques or methods, in collecting, removing, hauling, and dumping of asbestos-containing materials.

g. Violated agency regulations issued pursuant to the United States Occupational Safety and Health Act, 29 U.S.C. §651, et seq.

h. Violated other agency regulations, including without limitation the United States Environmental Protection Agency National Emission Standards for Hazardous Air Pollutants, adopted originally as Part 61, Chapter 1, Title 40 of the Code of Federal Regulations effective on April 6, 1971.

i. Violated regulations issued by the Wisconsin Industrial Commission, including without limitation General Orders on Dusts, Fumes, Vapors and Gases, Order 2002; And Wis. Adm. Code Ind 12.20;

j. Exceeded other air quality standards or guidelines, including without limitation the Wisconsin Division of Natural Resources and Threshold Limit Values of the American Conference of Governmental Industrial Hygienists; and

k. Failed to take corrective action after being put on notice of the above negligent acts.

113. The asbestos fibers caused special injury of asbestos related disease to decedent Valmore Prust.

114. The contamination by asbestos fibers from the Marshfield plant operations:

a. Adversely affected the health interests of the community at large;

b. Interfered with the public health and safety;

c. Interfered with the right of decedent to enjoyment and use of his property.

25

115.   As a direct and proximate result of the nuisance, the decedent was injured as described above

## COUNT IV – INTENTIONAL NUISANCE

116.   Plaintiff incorporates by reference all general allegations above and brings this count against defendant Weyerhaeuser for intentional public and private nuisance.

117.   Weyerhaeuser is responsible for the ownership and operation of the door manufacturing plant in Marshfield, Wisconsin during the period of decedent's exposures.

118.   The operations of Weyerhaeuser's Marshfield plant caused release and emission of dangerous asbestos fibers which contaminated the air in the surrounding community where decedent lived.

119.   The operations of Weyerhaeuser's Marshfield plant caused dangerous asbestos fibers to be transported to areas more distant through various means, including without limitation

    a.   contaminated worker clothing and personal effects; and

    b.   collecting, removing, hauling, and dumping asbestos waste materials.

120.   The plant emissions and transport of asbestos fibers as described above caused contamination of the community, housing, vehicles, lunchroom and other places frequented by decedent Valmore Prust.

121.   The contamination by the asbestos fibers is an unreasonable interference with a right common to the general public to clean air.

122.   The contamination by the asbestos fibers is an unreasonable interference with decedent's right to use and enjoyment of private property.

123.   Decedent and others inhaled asbestos fibers from the contaminated air and property.

124.  The unreasonable interference with the public right to clean air and the private property rights is unrelated to any employment relationship or duties with defendant.

125.  Weyerhaeuser had knowledge of the dangers of asbestos fibers to cause serious diseases and death.

126.  Weyerhaeuser created conditions and activities that released asbestos fibers into the community as a result of Weyerhaeuser's operations of the Marshfield plant and transport of asbestos fibers to other locations as a result of plant operations.

127.  Weyerhaeuser knew that asbestos fibers were being released into the community and transported to other locations as a result of plant operations.

128.  Weyerhaeuser knowingly, intentionally, and recklessly permitted the Marshfield plant operations to continue without abating the release into the community and transport to other locations of asbestos fibers.

129.  Decedent Valmore Prust suffered the special injury of asbestos related disease.

130.  The contamination by asbestos fibers from the Marshfield plant operations:

    d.    Adversely affected the health interests of the community at large;

    e.    Interfered with the public health and safety;

    f.    Interfered with the right of decedent to enjoyment and use of their property.

131.  The conduct of Weyerhaeuser created an intentional nuisance for Weyerhaeuser is liable to decedent for the injuries as described above.


## COUNT V– PRODUCTS LIABILITY – STRICT LIABILITY

132.  Plaintiff brings this claim for strict liability against defendant 3M.

27

133.   Plaintiff restates and re-alleges the allegations set forth in lines 1-131 above.

134.   Defendant was at all relevant times in the business of selling personal protective equipment, including without limitation masks.

135.   Defendants knew and expected the masks would be used to protect against the inhalation of asbestos fibers.

136.   Defendant placed its masks into the stream of commerce with the expectation that they would reach decedent and other users and consumers without substantial change in the condition they were in when they left the possession or control of defendants.

137.   Defendant's masks reached decedent without substantial or unforeseeable change in the condition in which it was sold.

138.   Decedent used defendant's masks in the condition in which they left the possession or control of such defendants.

139.   Defendant's masks was defective and unreasonably dangerous at the time it left the possession or control of defendants in one or more of the following ways:

   a.   Failed to adequately warn decedent or others of the health hazards of asbestos which existed when wearing defendant's masks;

   b.   Failed to investigate or test for the effectiveness of the masks in preventing the inhalation of asbestos fibers;

   c.   Failed to instruct decedent, his employers, or others about the inadequacies of using the masks as precautionary measures against airborne asbestos fibers;

   d.   Defectively designed such that the masks did not adequately protect against or prevent exposure to asbestos fibers;

      a.   Failed to specify or instruct in the proper use of the masks.

140.   As a direct and proximate result of the acts and omissions of the defendants above, the

decedent was injured as described above.

## **COUNT VI – PRODUCTS LIABILITY – NEGLIGENCE**

141.   Plaintiff brings this claim for negligence against defendant 3M.

142.   Plaintiff restates and re-alleges the allegations set forth in lines 1-140 above.

143.   It was reasonably foreseeable that defendant's personal protective masks would be used to prevent exposure to asbestos.

144.   Defendants knew and expected the masks would be used to protect against the inhalation of asbestos fibers.

145.   Defendants represented or held out the masks to be adequate in the protection against inhalation of asbestos fibers during the type of operations at the Marshfield plant.

146.   The masks did not properly protect against inhalation of asbestos fibers from the operations at the Marshfield facility.

147.   Defendant had a duty to exercise reasonable care for the safety of decedent and others who used defendants' personal protective equipment to protect against exposure to asbestos fibers.

148.   Defendant knew or in the exercise of ordinary or reasonable care ought to have known asbestos causes disease and/or death.

149.   Defendant breached its duty of care and was negligent, including without limitation in one or more of the following acts or omissions:

   a.   Failed to adequately warn decedent or others of the health hazards of asbestos which existed when wearing defendant's masks;

   b.   Failed to investigate or test for the effectiveness of the masks preventing the

29

inhalation of asbestos fibers;

c.     Failed to instruct decedent, his employers, or others about the inadequacies of using the masks as precautionary measures against airborne asbestos fibers;

d.     Defectively designed its personal protective equipment such that it did not adequately protect against or prevent exposure to asbestos fibers;

a.     Failed to specify or instruct in the proper use of the masks.

150.    As a direct and proximate result of the acts and omissions of the defendants above, the decedent was injured as described above.

## COUNT VII – CIVIL CONSPIRACY

151.    Plaintiff brings this cause of action for civil conspiracy against defendant Metropolitan Life Insurance Company.

152.    Plaintiff restates and re-alleges the allegations set forth in lines 1 – 150 above.

153.    Defendant Metropolitan Life and other unnamed co-conspirators knowingly and willfully combined, agreed, and conspired with each other for the purpose of accomplishing one or more of the following unlawful purposes:

a.     Suppressing information about the health hazards of asbestos, including medical and scientific data, from those persons who would be exposed to the asbestos from the products made and sold by the conspirators,

b.     Affirmatively asserting, in a manner not warranted by the information possessed by the conspirators, claims that the conspirators knew were false, namely, that it was safe to work with and in close proximity to asbestos.

154.    One or more of the conspirators, including Metropolitan Life, performed the following tortious acts in furtherance of the conspiracy:

a.     Failed to warn about health hazards of asbestos; failed to investigate health hazards of asbestos;

b.      interfered with scientific and medical studies about the health hazards of asbestos; or

c.      failed to instruct about precautionary measures required for protection.

155.    As a direct and proximate result of the acts of the conspiracy described above, the decedent was injured as described above.

## COUNT VIII – PUNITIVE DAMAGES

156.    Defendants acted maliciously, with intentional disregard for the rights of decedent for which Plaintiff is entitled to recover punitive damages.

## COUNT IX - DECLORATORY JUDGMENT – UNCONSTITUTIONAL

157.    In 1995 Wisconsin enacted Act 17 which created restrictions on recoveries by victims of personal injuries.

158.    In 2011 Wisconsin enacted Act 2 which created restrictions on recoveries by victims of personal injuries.

159.    On March 27, 2014 Wisconsin enacted 2013 Act 154 which imposes requirements and creates restrictions on victims of asbestos-related injuries.

160.    Plaintiff seeks a declaration that retroactive application of 2005 Act 155 and 2011 Act 2 to limit the recovery in this case is unconstitutional.

161.    Plaintiff seeks a declaration that 2013 Act 154 is not applicable to this case or, in the alternative, that the requirements and restrictions it creates are unconstitutional.

## PRAYER FOR RELIEF

Plaintiff prays for relief as follows:

a.      Judgment against defendants, jointly and severally, for compensatory and general damages.

b.   Punitive damages in an amount to be determined against each defendant.

c.   A declaration that 1995 Act 17 and 2011 Act 2 are unconstitutional as applied to this case.

d.   A declaration that 2013 Act 154 is not applicable to this case, or, in the alternative, that the requirements and restrictions it creates are unconstitutional.

e.   Such further legal and equitable relief as the court orders to do justice in this case, including without limitation award of costs and disbursements of this action.

## JURY TRIAL DEMAND

Plaintiff hereby demands a trial by a jury.

Dated: September 19, 2014

/s/ Robert G. McCoy
Attorney for Plaintiff

Michael P. Cascino
Robert G. McCoy
Cascino Vaughan Law Offices, Ltd.
220 S. Ashland Avenue
Chicago, Illinois 60607
Phone: 312.944.0600
Fax: 312.944.1870
Email1: ecf.cvlo@gmail.com
Email2: mcascino@cvlo.com
Email3: bmccoy@cvlo.com

# Exhibit A

Defendants' States of Incorporation and Principal Places of Business

| Defendant | State of Incorporation | State of Principal Business |
|---|---|---|
| 3M Company | Delaware | Minnesota |
| Metropolitan Life Insurance Company | Delaware | New York |
| Owens-Illinois Inc. | Delaware | Ohio |
| Weyerhaeuser Company | Washington | Washington |